NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

CLINTON ROBERTS, et al., *Plaintiffs/Appellees*,

*v.*

STATE OF ARIZONA, *Defendant/Appellant*.

No. 1 CA-CV 25-0246

FILED 03-05-2026

Appeal from the Superior Court in Maricopa County
No. CV2019-005879
The Honorable John R. Hannah Jr., Judge *Retired*

**CLASS CERTIFICATION ORDER VACATED; REMANDED**

COUNSEL

Napier, Baillie, Wilson, Bacon & Tallone PC, Phoenix
By Michael Napier, Juliana B. Tallone
*Counsel for Plaintiffs/Appellees*

Arizona Attorney General's Office, Phoenix
By Rachel M. Remes
*Co-Counsel for Defendant/Appellant*

Struck Love Acedo PLC, Chandler
By Daniel P. Struck, Anne M. Orcutt, Kristina R. Rood, Nicholas D. Acedo
*Co-Counsel for Defendant/Appellant*

---

## MEMORANDUM DECISION

Judge Cynthia J. Bailey delivered the decision of the Court, in which Presiding Judge Daniel J. Kiley and Judge D. Steven Williams joined.

---

**B A I L E Y**, Judge:

**¶1**          Defendant State of Arizona appeals the superior court's order certifying two subclasses under Arizona Rule of Civil Procedure ("Rule") 23. For the following reasons, we vacate the order and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

**¶2**          Plaintiff Clinton Roberts is a correctional officer employed by the Arizona Department of Corrections, Rehabilitation and Reentry (the "Department"). Plaintiff Donna Christopher-Hall is a former Department correctional officer. Plaintiffs sued the State on behalf of themselves and others similarly situated, alleging they are entitled to overtime compensation pursuant to Arizona Revised Statutes ("A.R.S.") section 23-392 for time spent on uncompensated mandatory and extensive pre- and post-shift activities.

**¶3**          According to Plaintiffs, when correctional officers arrive at Arizona prison facilities, they are required to show identification, answer questions about whether they are carrying contraband, empty all possessions for a search, pass through a metal detector, and have their possessions X-ray scanned. At certain facilities, officers must wait for a tram to transport them to their assigned work unit. Officers may then be subject to additional screening at their assigned work unit, including metal detection and a search of their possessions. Before reporting to their assigned units, officers must obtain keys, radios, and other gear from an equipment depot. When they report to their unit, some officers are required to receive a "pass-down briefing" from the officer leaving the post. At the end of their shift, officers give a pass-down briefing to incoming officers, return their keys and other equipment to the depot, and travel to the exit gate. At some facilities, the officers are subject to a vehicle search before they can exit. We refer to these activities collectively as the "pre- and post-shift activities." The Plaintiffs offered their own declarations that, at the

Lewis prison, these uncompensated activities took between one and three hours per week.

**¶4** The State offered evidence that not every correctional officer is required to engage in all of the pre- and post-shift activities and disputed Plaintiffs' allegation that officers are not compensated for any time spent participating in pre- and post-shift activities. It also submitted evidence that Plaintiffs' time estimates were overstated and that the time required for the pre- and post-shift activities varies considerably by prison facility, assigned unit, individual employee, day, and shift.

**¶5** Plaintiffs sought class certification under Rules 23(b)(1)(B) and 23(b)(3). The superior court concluded that common issues predominated and granted Plaintiffs' motion for class certification under Rule 23(b)(3), but rejected certification under Rule 23(b)(1)(B). It found that "all corrections officers in all locations undergo pre-shift screening," that "those who work at specific facilities are screened post-shift as well," and that "corrections officers are not paid for this time, as a matter of policy." It defined the class as "all former or current corrections officers" who are required by the Department to engage in the pre- and post-shift activities and divided the class into two subclasses:

(1) All corrections officers who are required to undergo security screening before their shift either at the main prison gate, the assigned work unit, or both.
(2) All corrections officers who are required to submit to a vehicle search and pat down before leaving the prison complex at the end of their shift.

**¶6** The State timely appealed. We have jurisdiction pursuant to A.R.S. § 12-1873(A).

## DISCUSSION

**¶7** The State argues the superior court abused its discretion by certifying the class because Plaintiffs did not prove that common questions predominate over individual questions as required by Rule 23(b)(3).[1] We

---

[1] The State also challenges the superior court's Rule 23(b)(3) superiority determination and the court's formulation of the subclasses. Because we vacate the class certification order on predominance grounds, we do not reach these issues.

review the superior court's class certification decision for an abuse of discretion. *Ferrara v. 21st Century North America Ins. Co.*, 245 Ariz. 377, 380, ¶ 6 (App. 2018). A court abuses its discretion when it commits an error of law or if there is no substantial support in the record for its conclusion. *Flying Diamond Airpark, LLC v. Meienberg*, 215 Ariz. 44, 50, ¶ 27 (App. 2007).

**¶8** A plaintiff seeking class action certification must meet all the requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). Ariz. R. Civ. P. 23(a) & (b); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011).[2] The plaintiff has the burden to prove by a preponderance of the evidence that these prerequisites are satisfied, *Ferrara*, 245 Ariz. at 380, ¶ 6; *Wal-Mart*, 564 U.S. at 350-51; *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods, LLC*, 31 F.4th 651, 665 (9th Cir. 2022), and the trial court must conduct a "rigorous analysis" to decide whether the plaintiff has carried that burden. *Wal-Mart*, 564 U.S. at 350-51.[3] This may require the court to "probe behind the pleadings," such that its class certification analysis may overlap with the merits of the underlying claims to the extent necessary to determine whether the Rule 23 prerequisites are satisfied. *Wal-Mart*, 564 U.S. at 350-51; *Olean*, 31 F.4th at 667 (internal citation omitted).

**¶9** The superior court found that Plaintiffs had established all of the Rule 23(a) requirements: numerosity, commonality, typicality, and adequacy. It found that the case was not suitable for class action treatment under Rule 23(b)(1)(B), but that Plaintiffs had satisfied Rule 23(b)(3) by showing that "the questions of law and fact common to the entire class predominate over any questions affecting only individual class members, and that a class action is superior to other available methods for adjudicating the controversy." The State challenges this predominance ruling, arguing the common question Plaintiffs identify (whether the pre- and post-shift activities are "work" under A.R.S. § 23-392) is not capable of

---

[2] Because Rule 23 is identical to Federal Rule of Civil Procedure 23, federal cases construing the federal rule are authoritative. *Ferrara*, 245 Ariz. at 380 n.2, ¶ 6.

[3] The State questions the superior court's statement in its ruling that Rule 23 "should be construed liberally, and doubts concerning whether to certify a class action should be resolved in favor of certification," arguing that this is no longer the correct standard under recent United States Supreme Court decisions, including *Wal-Mart*. The superior court, however, recognized the more rigorous standard discussed in *Wal-Mart* and purported to apply it.

class-wide resolution, and the remaining inquiries necessary to resolve Plaintiffs' claims require individual proof.

**¶10**         The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). To decide this question, a court must consider whether common questions—those where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof"—are more prevalent or important than individual questions—those where "members of a proposed class will need to present evidence that varies from member to member." *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (internal citation omitted).

**¶11**         The predominance inquiry "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011); *Neale v. Volvo Cars of North America, LLC*, 794 F.3d 353, 370 (3rd Cir. 2015). By understanding the elements of a cause of action, the court can determine whether the evidence needed to satisfy each element may be common to the class or must be individual to each class member. *Neale*, 794 F.3d at 371. The mere existence of individual questions does not defeat class certification, but Rule 23(b)(3) requires that the common questions predominate over any individual questions. *Id*.

**¶12**         Here, to prevail on their claim for failure to pay overtime compensation under A.R.S. § 23-392, each class member will need to show not only that the pre- and post-shift activities constitute "work" under Arizona law, but also that the amount of time they spent engaged in those activities caused their total time worked to exceed 40 hours in a work week. *See* A.R.S. § 23-392(A) (requiring law enforcement officers to be compensated for time worked over 40 hours in a week).

**¶13**         The superior court ruled that no individual proof is needed for a court to determine whether the pre- and post-shift activities constitute "work." It based this decision on the assumption that the relevant inquiry is whether the pre- and post-shift activities are "primarily for the benefit of the employer." *See Prendergast v. City of Tempe*, 143 Ariz. 14, 19 (App. 1984) (stating the test to determine whether time is compensable as work is whether it was "predominantly for the employer's benefit or for the employee's benefit"). Assuming the *Prendergast* test applies, we reject the State's argument that the superior court erred by ruling that this issue is

subject to common proof.[4]  It is not, as the State contends, necessary to examine each class member about what they were doing during the pre- and post-shift activities to determine whether those activities were primarily for the benefit of the employer or the employee.  Rather, the court should look at the "totality of all the circumstances," including the nature of the work and the level of the restriction on the employee's time to decide if this time is compensable as work.  *Prendergast*, 143 Ariz. at 20.  This is not an employee-by-employee decision, but one common to all class members that does not require individual proof.

¶14        That is not the end of the inquiry, though, as no class member would be entitled to relief unless they could show the amount of time they spent on pre- and post-shift activities, that this time caused their total work time to exceed 40 hours in a week, and the amount of overtime compensation (if any) they are owed.  *See Tyson Foods*, 577 U.S. at 464 (Roberts, J., concurring).  The State argues these inquiries require individual proof and predominate over the common question of whether the activities are compensable.

¶15        The superior court ruled that no individualized proof would be necessary on these questions because it found that all corrections officers are required to undergo the pre- and post-shift activities and, as a matter of policy, are not paid for this time.[5]  It wrote that a straightforward damages calculation could be made based on the class members' time records, which would contain information about "where and when they went through entry and exit screenings."  The court posited that the duration of the pre- and post-shift activities in any given location could be proven by "sample observations extrapolated over time" and an expert analysis of this information would allow Plaintiffs to make a "sufficient collective case for damages, even if the damages calculations also involve some individualized inquiries."

¶16        While this may be a reasonable approach, it is not one proposed or supported by Plaintiffs, who had the burden on this issue.

---

[4] *See Roberts v. State*, 253 Ariz. 259, 270, ¶ 45 (2022) (declining to decide "whether the *Prendergast* definition of work remains operative, whether subsequent developments may have altered it, or whether any Arizona statutory provisions provide guidance on the meaning of work").

[5] There is evidence, however, that Department employees are compensated for some of the time they spend on pre- and post-shift activities.

*Haliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014); *see also* Ariz. R. Civ. P. 23(c)(1)(B)(iv) (requiring the superior court to describe the evidence supporting the court's determination); A.R.S. § 12-1871(B) ("If the court finds that an action should be maintained as a class action, the court shall . . . describe all evidence in support of its determination."). In their motion for class certification, Plaintiffs offered merely the conclusory statement that "common questions of law and fact predominate over any individual questions of law and fact."[6] Even after the State presented evidence of the extensive individual issues that it believed would need to be resolved to determine whether each class member was harmed and the amount of their damages, Plaintiffs' reply merely stated that they could "obtain expert reports that deal with time and motion studies and damages." This in no way satisfied their burden to show the prerequisites to class certification by a preponderance of the evidence. *Haliburton*, 573 U.S. at 275; *Comcast*, 569 U.S. at 33; *Wal-Mart*, 564 U.S. at 350-51; *Olean*, 31 F.4th at 665. Plaintiffs themselves appear to have recognized this shortcoming, as before the superior court granted class certification, Plaintiffs moved to supplement the record to include an expert declaration of how to calculate damages on a class-wide basis.

¶17        It is also not apparent from the record that common questions would predominate over individual questions, as the evidence shows that not all correctional officers are subject to the same pre- and post-shift activities.

- The Department operates nine prison facilities, many of which have multiple units.[7]

- The volume of traffic and level of scrutiny at each facility varies by complex, day, and shift.

- Security screening procedures also vary by prison facility and unit and have changed over time. At seven prison facilities, correctional officers proceed directly to their assigned units and pass through a single security screening. Other facilities required an additional

---

[6] The only common question Plaintiffs identified was whether the pre- and post-shift activities "are considered time worked and therefore subject to compensation pursuant to A.R.S. § 23-392."

[7] A tenth prison facility closed during the class period.

screening for some – but not all - units for part of the time period in question.

- When correctional officers are screened, at some locations their belongings are X-rayed while they walk through a metal detector. At other facilities, officers' belongings are manually searched while they walk through a metal detector. If officers do not clear the metal detector, they may be subject to additional searches. One unit uses an electronic scanner instead of a metal detector.

- Trams are available at two prison facilities (previously three facilities) to transport employees to some—not all—of the units at those facilities. Correctional officers are not required to use the trams and the amount of time it takes to ride the tram will vary by prison facility, unit, day, shift, and the number of operating trams.

- Correctional officers who work eight-hour shifts are required to attend a pass-down briefing when they begin their shift, but are given fifteen minutes of overtime compensation for attending the briefing. Officers who work ten or twelve-hour shifts do not attend pre-shift briefings.

- Officers working an eight-hour shift are not required to provide a post-shift briefing to the incoming officer for the next shift. If working at certain posts, they may be required to wait for an incoming officer or other staff member to relieve them, in which case they may submit an overtime request or, at their supervisor's discretion, receive flex time.

- Not all correctional officers are required to obtain keys and radios at the start of their shift; this requirement varies by unit and post. Correctional officers working an eight-hour shift may obtain this equipment during or after their shift briefing, in which case this time is compensated. Correctional officers working ten or twelve-hour shifts obtain this equipment after the start of their shift, and this time is compensated. The time for obtaining equipment varies significantly by unit, shift, post, and assignment.

- Several prison facilities do not conduct vehicle exit searches, but even at those that do, the procedure varies by unit and, in some cases, has changed over time.

- A correctional officer's unit assignment may vary by shift, changing the pre- and post-shift activities they are required to follow.

¶18  Given these significant individual factors, determining the amount of time each class member spent on pre- and post-shift activities is likely to require extensive individual inquiry and is not susceptible to generalized, class-wide proof. *See Tyson Foods*, 577 U.S. at 454-60 (discussing when representative evidence may be used to establish class-wide liability). A similarly extensive inquiry was required in a recent case over the compensability of time spent in employee bag checks at Kirkland's stores. *Miles v. Kirkland's Stores Inc.*, 89 F.4th 1217 (9th Cir. 2024). There, because bag check frequency and practices varied by store, employee, and manager, the court would have to "inquire into the individual practices of each store, manager and employee—something that would not allow a court to resolve the issue in 'one stroke.'" *Id.* at 1225 (citation omitted). The level of individualized inquiry required in *Miles* sufficed to render the class inappropriate for certification and was arguably less extensive than what would be required here. *Id.* at 1226.

¶19  Nor does the evidence support the superior court's conclusion that the calculation of overtime owed to each class member is straightforward.

- Correctional officers work eight-, ten-, or twelve-hour shifts. The Department does not use time clocks to track correctional officers' hours. Instead, officers track their own hours, record them to the nearest 15 minutes, and submit them.

- Before fiscal year 2019, correctional officers manually recorded their hours on printed forms and submitted any later corrections on paper. Officers' time has been recorded electronically since fiscal year 2019. Timecard corrections continue to be documented on paper.

- Requests for overtime have always been submitted and maintained on paper. Correctional officers may elect to receive overtime as compensatory time or cash payment.

- Determining the amount of overtime, if any, each class member is entitled to for pre- and post-shift activities would require manual review of payroll, personnel, training, and security records, which may be stored in several different locations and in either paper or electronic format.

- Not all class members were employed for the entire class period and promotions, demotions, or rehiring may have affected their pay and overtime rates. The overtime rate for each class member at any given time during the class period would vary depending on if they received high-risk assignment pay, a geographic stipend, performance awards, merit increases, bonuses, and other incentive pay. This information would have to be extracted from personnel files with manual calculations and adjustments for the historical overtime rates applicable to each individual.

- Correctional officers who were on leave or suspended during any work week in the class period would not have engaged in the pre- and post-shift activities for that week and therefore would not be eligible for overtime for those activities. Correctional officers working a light-duty assignment or partial days during any work week in the class period may have been subject to some, but not all, of the pre- and post-shift activities for that week. Determining an officer's leave or other special assignment status would require a manual review of any paper time records and the electronic timekeeping system.

- Correctional officers assigned to offsite posts or participating in offsite training or specialty activities do not engage in the pre- and post-shift activities. To determine whether a class member fits into one of these categories would require manual review of shift rosters or training records and/or verifying the information with the supervisor.

¶20 These undisputed facts contradict the superior court's findings that all corrections officers in all locations undergo pre- and post-shift screening, and that officers are not paid for screening time. Additionally, determining whether each of the 8,000-plus correctional officers employed by the Department during the class period is entitled to damages for the time they spent on the pre- and post-shift activities and calculating those damages will require extensive individual inquiry. Although individualized questions related to damages do not prevent certification under the predominance requirement, *Tyson Foods*, 577 U.S. at 453, certification is not appropriate when "determining liability for all class members would require complicated individualized inquiries." *Castillo v. Bank of America, NA*, 980 F.3d 723, 731-32 (9th Cir. 2020) (affirming trial court's denial of class certification because plaintiff did not establish a common method of proving the fact of injury and any liability). The individual questions here concern not just damages calculations, but

whether each class member is entitled to damages. Plaintiffs offered no evidence that those questions can be answered on a class-wide basis, distinguishing it from the cases Plaintiffs cite, for the proposition that individualized damages do not defeat class certification. *See Vaquero v. Ashley Furniture Indus. Inc.*, 824 F.3d 1150, 1153, 1155 (9th Cir. 2016) (plaintiff introduced representative liability evidence and proposed to establish damages through use of a survey, sampling evidence, or a special master); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (plaintiffs offered evidence that the only individual question—damages—could be calculated using defendant's computerized payroll and time-keeping database). *See also Olean*, 31 F.4th 651 (plaintiffs offered a statistical regression model showing price-fixing caused class-wide antitrust impact); *McDaniel v. Wis. Dep't of Corr.*, 416 Wis.2d 516, 523-25, 538-39, ¶¶ 6, 12, 46-50, 21 N.W.3d 749, 753-54, 759-60 (Wis. Sup. Ct. 2025) (plaintiff presented an expert who proposed a method to determine damage calculations for correctional officer screening activities).

¶21 Plaintiffs had the burden to produce evidence that liability and damages calculations could be resolved as common questions or would not predominate over the common questions if decided individually. They failed to do so. *Haliburton*, 573 U.S. at 275; *McDaniel,* 416 Wis.2d at 523-25, 538-39, ¶¶ 6, 12, 46-50, 21 N.W.3d at 753-54, 759-60. Without such evidence, the superior court abused its discretion in finding that Plaintiffs had met their burden to establish predominance under Rule 23(b)(3). *Ferrara*, 245 Ariz. at 380, ¶ 6; *Haliburton*, 573 U.S. at 275.

## CONCLUSION

¶22 For the foregoing reasons, we vacate the superior court's order certifying the class and remand for further proceedings.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:      JR